IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANA D. RODRÍGUEZ-ORTEGA
NANCY VÉLEZ-RODRIGUEZ
Plaintiffs

vs

PHILIP MORRIS, INC.
PHILIP MORRIS COMPANIES, INC.
Defendants

CIVIL 03-1529CCC

## OPINION AND ORDER

The action before us was filed pursuant to the federal Cigarette Labeling and Advertising Act (Labeling Act), 15 U.S.C. §1331, et seq., and under Puerto Rico law pursuant to our diversity jurisdiction.[1] Plaintiffs Ana Rodríguez-Ortega ("Rodríguez") and her daughter Nancy Vélez-Rodríguez ("Vélez") brought this tobacco-product liability action against defendants Philip Morris Usa Inc. ("PM USA") and Philip Morris Companies, Inc. ("Altria").[2]  Altria was dismissed from this action on April 16, 2004 (docket entry 41).

Although the Amended Complaint (docket entry 45) is divided into various "counts," there is an overlap of claims within the counts. On March 22, 2005, the Court dismissed all failure-to-warn claims arising after the Labeling Act became effective in 1969 (docket entry 88). Tort claims for manufacturing and marketing cigarettes after that date were also dismissed pursuant to the doctrine of conflict preemption. A claim contained in Count V based on unidentified Puerto Rico law was also dismissed. The request for punitive damages was stricken.

Three tort claims remain, the first of which pertains to the period prior to 1969 when Rodríguez began to smoke. She alleges that PM USA is strictly liable for damages caused by its products during that period because cigarettes were inherently dangerous and the company failed to provide warnings about the health hazards of cigarettes. In the second claim plaintiffs contend that PM USA marketed a defective, unreasonably unsafe product to consumers.

---

[1]Article 1802 of the Pureto Rico Civil Code, 31 L.P.R.A. §3151.

[2]As a result of a name change, Philip Morris Companies, Inc. is now known as Altria Corp.

CIVIL 03-1529CCC                                      2

Plaintiffs claim that defendant is therefore strictly liable for the damages they suffered as a result of Rodríguez's allegedly smoking-related illnesses. In the alternative, they allege that defendant's conduct was negligent in its defective design of cigarettes. Her last claim alleges that the company committed fraud by marketing a product it knew was inherently dangerous and by actively concealing information about those dangers, while presenting through its advertisements that smoking is a relaxing, romantic and sexy activity.

Vélez has claimed for damages that she has allegedly suffered because of the injury to her relationship with her mother due to her smoking related illnesses.[3]

The action is now before us on PM USA's Motion for Summary Judgment (**docket entry 79**), based on: 1) plaintiffs' failure to proffer evidence that any alleged failure to warn was the proximate cause of any damage to the plaintiffs and because PM USA had no duty to warn decedent of the dangers of smoking; 2) plaintiffs' failure to proffer sufficient evidence that defendant's product was defective and/or that a safer design of their product was available and commercially feasible; 5) plaintiffs' failure to proffer sufficient evidence to support their fraud, misrepresentation, and concealment claims; and 6) that plaintiffs' claims are time-barred. Plaintiffs' opposed the motion (**docket entry 95**).

Although we draw all reasonable inferences in favor of the nonmoving party, Cruz Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 280 (1st Cir. 2003), when faced with a properly documented summary judgment motion, the nonmovant can thwart the motion only by showing, through materials of evidentiary quality, that a genuine dispute exists about some material fact. Costa v. Ames Department Stores, Inc., 386 F.3d. 5, 8 (1st Cir., 2004); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (non-moving party must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in their favor with respect to each of the issues on which they have the burden of proof.)

---

[3]Plaintiffs incorrectly refer to this as a lack of consortium.

CIVIL 03-1529CCC                                       3

We therefore turn to the facts of this case, taken in the light most favorable to the plaintiffs.

Ms. Rodríguez was born in Barceloneta, Puerto Rico, on June 11, 1934. Ms. Rodríguez was the most educated of her eleven siblings. She completed high school in Puerto Rico and then studied nursing at the Arecibo District Hospital, where she graduated as a nurse in 1954.

Although she denied in her deposition testimony that prior to 1955, when she moved to New York, her parents never forbade her and her siblings to smoke cigarettes, she did, however, recall an incident when her father caught her older brother Marcelino smoking, nearly ripped his ear and made her brother eat the cigarette (Rodríguez' deposition, p.42). She could not recall why her father disapproved of her brother's smoking. Id.

The plaintiff stated that the first time she smoked was in 1950. (Id., at 145) and that they were unfiltered cigarettes, that she borrowed from the other nursing students. Plaintiff would take when she would take three or four puffs (Id., at 147-148). Ms. Rodríguez did not smoke again until she began purchasing her cigarettes when in the United States (Id., at 148). She testified at her deposition that she smoked unfiltered Chesterfield[4] cigarettes, which were not defendant's product and that it was not until 1961 that she began to smoke Marlboro cigarettes, the brand that she claims caused her injuries. (Id., at 149-150). In her answer to defendant's interrogatory 16, however, it is stated that she always smoked the Marlboro brand.

After moving to New York City, Ms. Rodríguez began a relationship with Santiago-Vélez ("Mr. Vélez"), the father of plaintiff Nancy Vélez. In the five years that they were together, she never let him see her smoke. She knew that he disapproved of smoking. Ms. Rodríguez completely stopped smoking during both of her pregnancies. (Id., at 47.) During her

---

[4]Defendant's Exhibit L, is the affidavit of Alan Berlin, PM USA's Director of U.S. Territories and Military Sales, in which he states that prior to June 26, 1978 neither PM USA nor its former subsidiary, Philip Morris de Puerto Rico, Inc., ever owned, designed, manufactured, produced, advertised, sold or distributed any cigarettes bearing the trade names or trademarks "L&M" or "Chesterfield." This is undisputed.

CIVIL 03-1529CCC                                  4

relationship with Mr. Vélez, she smoked only two cigarettes a day--one after he left in the morning and the second one before he arrived home at night. (Id., at 30-31.) Ms. Rodríguez continued her relationship with Mr. Vélez until 1959, according to her deposition testimony. Between 1961 and 1989, Rodríguez increased her cigarette consumption from two cigarettes a day to four or six per day. (Id., at 151-152.) She testified that from 1989 until 2000, her cigarette consumption remained at more or less six cigarettes a day. (Id.) In her answer to defendant's interrogatory 16, however, Rodríguez stated that she smoked three to four packs a day. Rodríguez testified that she stopped smoking completely, without any help, (Id., at 152) but elsewhere in the record it appears that she only reduced the number of the cigarettes she smoked. Prior to being diagnosed with lung cancer in May, 2002, (Defendant's Ex. E), Rodríguez' medical record from 1996 reflects that she suffered from asthma and was instructed to stop smoking ( Id., Ex. P.) Other medical records from 1997 and 2001 identify chronic obstructive pulmonary disease as one of her illnesses. (Id., Exs. T and U.)

In their opposition to the motion to summary judgment, plaintiffs allege that Rodríguez' memory has suffered, due to her illness and treatment. No medical evidence was produced to support this. To the contrary, the psychological evaluation report from their expert witness Dr. Francisco Javier Parga dated December 29, 2004 (plaintiffs' Exhibit B29) at page 2, ¶2 states that:

> Ms. Rodríguez is well oriented in time, space and person, however, her answers came slowly due to what has been diagnosed . . . as the initial stages of . . . Alzheimer's Disease.... <u>No memory lapses that limited the interview were observed by the evaluator.... Ms. Rodríguez demonstrated a very good recall</u>.

(Our emphasis.)

COMMON KNOWLEDGE

In order to succeed on their design defect and pre-1969 failure to warn claims, Rodríguez must show that ordinary consumers were unaware of health hazards and difficulties in quitting, when she became a smoker in the early 1950s. <u>Prado Alvarez</u>, 405 F.3d.36, 38-

CIVIL 03-1529CCC                                5

39 (1st Cir.2005); DeJesús Rivera v. R.J.Reynolds Tobacco, Inc., 368 F. Supp. 2d 148, 152 (D. Puerto Rico 2005).  A manufacturer cannot be held liable under either strict liability or negligence for failure to warn of a danger commonly known to the public.  Cruz Vargas v.R.J.Reynolds Tobacco, Inc., 348 F.3d, at 275.

    Common knowledge of the health hazards of cigarette smoking prior to 1969 requires an expert investigation.  "[The court] noted that the 'common-knowledge' defense is assessed objectively and, 'despite the nomenclature, it is a technical question involving methods, financing, and sources of research beyond the competence of lay determination, at least when pertaining to history forty or fifty years removed from the time of trial.'" Prado Alvarez, 405 F.3d. At 39-40 citing Cruz Vargas, 348 F.3d. at 273.

    Because plaintiff may not have begun  smoking Marlboro cigarettes until 1961, about five years after she arrived in New York, we must consider whether the ordinary consumer, in both New York and Puerto Rico, would have had knowledge of the health hazards associated with smoking as early as 1950.

    PM USA's expert witness on the common knowledge of consumers in New York, Dr. Michael Schaller, is a professor of history at the University of Arizona (defendant's Ex. G).  For the past nine years he has conducted extensive historical research on issues related to the use of tobacco.  His affidavit/report lists over 25 libraries, archives, universities and other repositories from which he collected his information.  He examined publications in both the English and Spanish languages national, New York and Puerto Rico, including newspapers and magazines.  He also identified other sources such as New York State and Commonwealth of Puerto education laws, school curriculum guides and classroom syllabi used by teachers, school health and physiology text books, popular slang usage, historical polling data, network television news and entertainment media.  Dr. Schaller's notes that as early as 1959-1960 there was a public school anti-smoking campaign, the goal of which was to persuade pupils never to start smoking.  The school program gave the students the facts of the correlation between the

CIVIL 03-1529CCC                                              6

increase of mortality among cigarette smokers due to lung cancer and other diseases. The report also addresses allegations of the tobacco "industry's decades-long willful and 'secret' intent to addict smokers who were unaware they were being drugged." Dr. Schaller explains that prominent tobacco critics used virtually identical language to condemn cigarettes as early as the 1920's. He states that as early as the 1920's, tobacco critics were accusing the cigarette industry of willful and "secret" intent to addict to nicotine, smokers who were unaware that they were being "drugged." He quotes from the April, 1926 issue of the No-Tobacco Journal in which it is stated that the cigarette is scientifically adapted to the inoculation of the system with nicotine, and later issues where it was reported that recent scientific studies had identified the "tars" in cigarette smoke as the likely source of the "recorded increase of cancer of the lung" among smokers. Dr. Schaller includes four pages of representative examples of the coverage about the risk of disease and addiction linked to tobacco use in the New York and Puerto Rico English and Spanish language press, between 1950 and 1964, noting that these reports on the dangers of smoking appeared far more frequently than stories that seemed to defend tobacco use or minimized its risk.

   Dr. Shaller identifies NewYork state and city government agencies, as well as private organizations, that disseminated information during the period in question which linked cigarettes to lung cancer, heart disease and other illnesses. Dr. Schaller also noted that at the time Rodríguez' children were enrolled in the public schools, the New York City Bureau of Public Health Education decided to make the city's school children the "focal point of a new drive to deter teenagers from smoking."

   In sum, Dr. Schaller has examined the nature, depth, intensity and basis of public awareness in the New York area concerning the general health and addiction risks of using tobacco and of the association between cigarette use and lung cancer and other diseases. His conclusion, which he supports with a 29-page, annotated report of his research, is that the average consumer in New York has been aware of the many health risks of smoking cigarettes

CIVIL 03-1529CCC                                              7

and of the addictive potential of nicotine for most of the past century, and certainly since 1950. Therefore, in his opinion, by the time Ms. Rodriguez first began to smoke on a regular basis, the dangers of cigarettes were common knowledge to the ordinary consumer in New York.

Plaintiffs have proffered no expert testimony whatsoever regarding the issue of "common knowledge" in New York to contradict the well-researched and well-reasoned opinion of PM USA's expert on this issue.

Because it is also alleged that she smoked only Marlboro cigarettes, we must examine whether ordinary Puerto Rican consumer had knowledge of the health hazards of smoking cigarettes, from the earliest date that she alleges she began to smoke, 1950.

To rebut PM USA's contention that there was common knowledge in Puerto Rico of the health hazards, plaintiffs submitted the report and affidavit of their expert--history professor Dr. Luis Díaz.[5] Dr. Díaz, who has no previous experience as an expert witness and has not previously studied the subject of tobacco. His eight-page report, which contained no footnotes and did not identify the sources of his conclusions, was based on his investigation, which studied only the narrow topic of what information was available through governmental and educational sources and from the interviews of only two people.[6] In our opinion and order in Ramos v. Philip Morris, Inc., 2005 WL 2094757 (D. Puerto Rico), we discussed in detail the weaknesses in Dr. Díaz' investigation. Although he has revised his report to include a list of celebrities and other famous people who died of smoking related illnesses, and concludes (1) that the "whole Puerto Rican society was targeted by massive advertising campaigns of various tobacco

---

[5]Dr. Díaz has presented the report on his investigation in other tobacco cases filed by the attorney in this cases. Although the report has been slightly modified from the one submitted in Ramos v. Philip Morris, Inc., 2005 WL 2094757 (D. Puerto Rico), the investigation described is the same.

[6]Dr. Díaz' report mentions the same two interviews as contained in earlier version of his report, Ramos, supra. It appears from his deposition, however, at page 14, that he conducted four interviews.

CIVIL 03-1529CCC                    8

companies...," (2) that "[t]he advertising either caused Puerto Ricans [to] believe [that] smoking was the ["in"] thing to do or they became confused about the health consequences of smoking and (3) that they had no common knowledge of the addictive nature of cigarette smoking," the weaknesses in his report remain.  The only specific support is an attachment of a cigarette warning that included unidentifiable photos and an illegible list entitled "All Died from Smoking." Once again, the opinions expressed in Dr. Díaz' report are, as before, unsupported.

      PM USA submitted the affidavit of its expert Dr. Guillermo A. Basalt, (Ex. D) who has taught history for the past twenty-seven years, including courses addressing the history of tobacco in Puerto Rico from 1510- 2004, mass communication and oral history.  The detailed, fifty-six-page report set out the investigation's question as:  whether by the middle of the 20th century the average consumer in Puerto Rico was aware that (1) cigarette smoking carried significant health risks, and that it could shorten life and lead to serious diseases, including lung cancer; and (2) cigarette smoking can be habit-forming, addictive and/or difficult for many people to quit.  Dr. Baralt's reports contains over 150 footnotes identifying the sources of the statements upon which he bases his opinions that:

> before and during the period Ms. Rodríguez' life in Puerto Rico, there was widespread, pervasive common knowledge (i.e., the average consumer was aware) that cigarette smoking can cause serious, life-shortening diseases, such as lung cancer, chronic bronchitis, emphysema, hypertension, and cardiovascular diseases.  In addition, it is also my opinion that during this same time period, there has also been widespread common knowledge that cigarette smoking can be habit forming, addictive and very difficult for some to quit.

Baralt affidavit, at 55.

      In light of these contrasting reports, no reasonable jury, confined to record before us, could conclude that the general public in Puerto Rico lacked knowledge about the health risks

CIVIL 03-1529CCC                                        9

of smoking, including lung cancer by 1950, when Rodríguez experimented with her first cigarette.[7]

DESIGN DEFECTS

In order to prove their product liability claim based on their allegation that the design of defendant's cigarettes was defective, the plaintiffs must establish that (1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) that the negligent act or omission caused plaintiff's harm." Cruz Vargas, 218 F.Supp.2d., at 118; Nieves Rodríguez v. R.J.Reynolds Tobacco Company, 2005 WL 2346910 *7 (D. Puerto Rico). Plaintiffs bear the burden of establishing the applicable standard of care, and of proving that PM USA acted below that standard. Prado Alvarez, 313 F. Supp. 2d at 73.

Plaintiffs have not named an expert on cigarette design who could testify that PM USA was negligent in the design of its cigarettes.[8] They point to their Ex. AM, an article published in the United Kingdom entitled The safer cigarette: what the tobacco industry could do and why it hasn't done it, as containing "numerous patents [that] were available which could have made cigarettes less harmful."[9] In their memorandum, however, they do not discuss whether similar processes existed in the United States or, if they were available and not used by PM USA, how they would have made defendant's cigarettes safer had they been used. Notwithstanding all the content of exhibits that they have included, plaintiffs have not

---

[7]We also note that the Circuit Court affirmed the District Courts' determination that there has long been common knowledge in Puerto Rico of cigarette-related health problems prior to the Labeling Act. See, Prado Alvarez ,405 F.3d., supra, at 43.

[8]Plaintiff argues that the affidavit of Dr. Parga, Ex.B29, the psychologist who evaluated Rodríguez, raises genuine issues of fact relative to failure to warn and design defects. Dr. Parga's affidavit is directed to determining if Rodríguez suffered from a nicotine dependence. Our discussion on common knowledge, supra at 6-11, obviates the need for further discussion of the failure to warn issue, and there is nothing in the affidavit that suggests the Dr. Parga knows anything about cigarette design.

[9]Plaintiffs' opposition to the motion for summary judgment, page 37.

CIVIL 03-1529CCC                             10

demonstrated that there is a design for a safe cigarette, one which would not have been hazardous to Rodríguez' health. Nor have they identified what was the standard of care to which PM USA failed to conform. Under the common knowledge doctrine a defendant neither breaches a duty nor causes the product to be inherently dangerous when the allegedly omitted warning concerns a danger of which the public is well aware <u>Cruz-Vargas v. R.J. Reynolds Tobacco Co.</u>, 348 F.3d at 276. (check page). Moreover, the matter is somewhat academic; Rodríguez admitted at her deposition that she never smoked any "light" or low tar cigarettes (at 62), a fact that was confirmed by her daughter (Nancy Vélez' deposition at 282); that is, she failed to take advantage of design changes when they became available.

To support its position that Marlboro did not have a design defect PM USA presented the affidavit of Dr. Jerry F. Whidby (Exhibit R), an analytical research chemist who was an employee of and a consultant to PM USA for thirty years. He explained that the types and nature of tobacco used by defendant have changed over the years, and that many technologies have been introduced and improved, permitting drastic reduction in tar and nicotine yields as measured by the Federal Trade Commission (FTC) Method. (<u>Id.</u> at 3.) He stated that

> "[filtration, ventilation, paper porosity, reconstituted tobacco and expanded tobacco in particular have resulted in decreased FTC Method tar and nicotine deliveries. The net result of the adoption of various tar reduction techniques has been an industry-wide decrease of well over 60% in average sales Weight FTC Method tar yields between 1950 and 1995. The decline in FTC Method tar yield in [PM USA] products is of similar magnitude. Because nicotine yields generally change in proportion to tar yields, the techniques [PM USA] has lowered used to lower tar yields have lowered nicotine yields as well.

(<u>Id.</u>) (Citation omitted.)

As other experts before him, <u>see</u>, <u>e.g</u>. <u>PradoAlvarez</u>, 313 F. Supp. 2d. at 74-75, Dr. Whidby stated that "It is universally recognized that there is no safe or risk-free cigarette." (<u>Id.</u> at 6.) He went on to describe the various advancements and methods that defendant has implemented to reduce the harmful components in its cigarettes. He addressed plaintiffs' allegations that design of PM USA's cigarettes was intended to increase nicotine and the

CIVIL 03-1529CCC                                        11

addiction to it, and separated the negative inferences from the factual truths. He stated that "[c]igarette smoke results from the burning of tobacco which naturally contains carcinogens. [PM USA] does not add any carcinogens to its cigarettes." (Id.)

Dr. Whidby related the research efforts to remove the nicotine from cigarette tobacco started in the 1960s after intense research, development and engineering, PM USA was able to produce, in the mid-1980's, an almost nicotine-free cigarette. The product failed in test marketing across the United States, however, when consumers said it tasted bad, and, therefore, the product sales were poor. (Id.)

In sum, he opined that "[PM USA] has employed all available technologies to reduce the health risks of its cigarettes and [defendant] continues to work to reduce the inherent health risks of smoking." (Id. at 7)

Plaintiffs having failed to present materials of evidentiary quality to demonstrate that the defendant's cigarettes were defective designed, their claim for damages on this theory fails.

FRAUD CLAIM

Plaintiffs' fraud claim is premised on the allegation that defendant's misconduct was deceitful, misrepresentive (sic) and/or intentionally fraudulent by omission and/or concealment of information concerning the health hazards associated with smoking. Under Puerto Rico law, Rodríguez must establish: (1) that defendant made a false representation; (2) that she reasonably and foreseeable relied on it; (3) that she suffered injuries as a result of her reliance; and (4) that the defendant intended to defraud her. Wadsworth, Inc. V. Schwarz-Nin, 951 F. Supp. 78, 87 (D. Puerto Rico 1996).

A plaintiff asserting fraud must produce evidence that is strong, clear, unchallengeable, convincing, and conclusive, since a mere preponderance of the evidence is insufficient to establish fraud in Puerto Rico. See F.C. Imports, Inc. v. First National Bank of Boston, 816 F.

CIVIL 03-1529CCC                              12

Supp. at 78, 97 (D. Puerto Rico, 1998), citing In Re Las Colinas, 294 F.Supp. 582 (D. Puerto Rico, 1978 (rev'd. on other grounds). Moreover, plaintiffs cannot rest their fraud claim on mere conclusions, conjectures, and suppositions or suspicions. Id.

Defendant presented the following deposition testimony of the plaintiffs to demonstrate that Rodríguez did not rely on any statements or documents issued by PM USA.

When Rodríguez testified at her deposition that she did not switch to Marlboro cigarettes until she had been smoking for about five years, she added that she switched because Marlboro tasted better; that there was a sweetness to it that was very good (Rodríguez' deposition at150). She did not recall hearing anything that PM USA or any other tobacco company ever said about smoking. (Id., at 99). When Rodríguez was asked what she believed Phillip Morris did that was wrong in order for her to sue them, she answered that she didn't know. (Id., at 247.) Nancy Vélez also was unaware of any statement made by defendant or anything it failed to say that caused her mother to continue smoking (Nancy Vélez' deposition at 272). Nor was she aware of any PMUSA documents that caused her mother to start or to continue to smoke. (Id., at 274.) She also stated that they never discussed any cigarette advertisements, nor was she aware of any advertisements that started or kept her mother smoking. (Id., at 392.) When plaintiff Vélez was asked by the PM USA's attorney, "other than making cigarettes, are you aware of anything [PM USA] did that caused you any damage?" she answered, "No."[10] (Id., at 274.)

Plaintiffs have submitted a myriad of documents and articles of questionable admissibility from which they would have us conclude that PM USA withheld information and intended to defraud smokers such as Rodríguez. We note, however, in both plaintiffs' opposition to the summary judgment motion as well as in their complaint, many of their allegations and arguments primarily address issues of "smokers" and "people" in general, at times lumping plaintiff into

---

[10]When defendant's counsel restated the question as, "Your claim is based on the fact that my client makes cigarettes?" her attorney objected to the form of the question. Her answer was "yes."

CIVIL 03-1529CCC                                        13

the classification– "plaintiff and the public."[11]  This is not a class action.  Plaintiffs had to offer proof as to Rodríguez specifically and they have failed to proffer any evidence of her reliance on actions of the defendant; to the contrary, Rodríguez' own testimony belies this claim.  See, Prado Alvarez, 313 F. Supp.2d at 77, (plaintiffs' fraud claim found to be without merit because there was no evidence that the decedent had ever heard any of the defendant's allegedly false statements or had relied on any of defendant's alleged misstatements).  We therefore find that plaintiffs' fraud claims fails.

Although plaintiffs argue in their opposition to the motion for summary judgment that PM USA's actions constitute a violation of Article 189 of the Puerto Rico Penal Code, 33 L.P.R.A. §4307, there is no such claim in their complaint.  Additionally, the Circuit Court has determined that without support to demonstrate a contractual obligation, which is also absent in our case, Prado Alvarez , supra, 405 F.3d. at 45, a claim for fraud under §4307 in the circumstances of our case would not proceed.

PROXIMATE CAUSE

Although Rodríguez lived in New York from for forty-five years, studied English (Rodríguez' deposition at 211) and can read magazines in English, (Id. at 253)[12] she stated during her deposition that she did not recall cigarettes having a warning on the packaging because "[she] would not pay attention" and that she has never read a warning on a package of cigarettes.[13]  (Id., at 99.)  She denied that they she was taught in nursing school that smoking could cause cancer (Id., at 254), but acknowledged that she learned smoking could cause

---

[11]See, e.g. the section entitled Phillip Morris' Deception Regarding the Health Risks of Smoking Blunted the Public's Awareness and Appreciation of Those Dangers and Defeats the Common Knowledge Defense,(Plaintiffs' opposition at 25-31).

[12]Rodríguez's understanding of English was evident at her deposition when she was able to answer question before they were translated into Spanish, and was able to read from documents in English (Id., at 261) for example..

[13]She did state, however, that if she had read the warning, she would have stopped smoking.

...

CIVIL 03-1529CCC                                   14

bronchitis and pneumonia, as well as emphysema, which could result in the development of lung cancer. (Id., at 255.) Rodríguez's full understanding of the dangers of smoking is further evidenced by the fact that she told her grandchildren not to smoke because it wasn't healthy for them, admitting that she knew this since their birth (Id., at 245). Notwithstanding this knowledge, Rodríguez knowingly accepted the health risks of smoking. She stated that from the time her daughter was a small child, she repeatedly asked her mother not to smoke because she didn't want her to get sick. Vélez knew that her mother suffered from asthma and she didn't want it to get worse from smoking. She also did not want her mother to get emphysema or lung cancer (Id.,at 265-66). Rodríguez admitted that she told Nancy and other people, "It's my choice; I've got to die from something."

As detailed above, Rodríguez chose to disregard family and friends' admonitions that she give up cigarettes because of its link to disease because she had "to die of something." This attitude was expressed notwithstanding the explicit warning on cigarette packages, which she chose not to read, that smoking causes lung cancer and other serious diseases. Thus, on this record, warnings appear irrelevant to decedent's decision-making. Prado Alvarez, 405 F.3d at 43.

For the above stated reasons, we GRANT PM USA's Motion for Summary Judgment (**docket entry 79**). Judgment will enter DISMISSING this action.

SO ORDERED.

At San Juan, Puerto Rico, on November 7, 2005.

<div style="text-align:right">S/CARMEN CONSUELO CEREZO<br>United States District Judge</div>


CIVIL 03-1529CCC                                   14

bronchitis and pneumonia, as well as emphysema, which could result in the development of lung cancer. (Id., at 255.) Rodríguez's full understanding of the dangers of smoking is further evidenced by the fact that she told her grandchildren not to smoke because it wasn't healthy for them, admitting that she knew this since their birth (Id., at 245). Notwithstanding this knowledge, Rodríguez knowingly accepted the health risks of smoking. She stated that from the time her daughter was a small child, she repeatedly asked her mother not to smoke because she didn't want her to get sick. Vélez knew that her mother suffered from asthma and she didn't want it to get worse from smoking. She also did not want her mother to get emphysema or lung cancer (Id.,at 265-66). Rodríguez admitted that she told Nancy and other people, "It's my choice; I've got to die from something."

As detailed above, Rodríguez chose to disregard family and friends' admonitions that she give up cigarettes because of its link to disease because she had "to die of something." This attitude was expressed notwithstanding the explicit warning on cigarette packages, which she chose not to read, that smoking causes lung cancer and other serious diseases. Thus, on this record, warnings appear irrelevant to decedent's decision-making. Prado Alvarez, 405 F.3d at 43.

For the above stated reasons, we GRANT PM USA's Motion for Summary Judgment (**docket entry 79**). Judgment will enter DISMISSING this action.

SO ORDERED.

At San Juan, Puerto Rico, on November 7, 2005.

S/CARMEN CONSUELO CEREZO
United States District Judge